May I proceed? Not yet. I'm giving everybody a chance to get settled. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Jonathan Edelstein, and I represent the plaintiff's appellants, the Frank family, in this matter. The District Court and opposing counsel have described what happened in this case as, quote, a measured and ascending use of force. They certainly got the ascending part right. I don't think there's any dispute about that. However, we would submit that on this record, the escalations in the use of force and the ultimate amount of force used were a long way from measured. And both clearly established law and what the officers themselves admitted that they observed, that they were trained in, and, you know, that they knew and saw at the time, show that they escalated too fast and went too far, and are not entitled to qualified immunity. Certainly what I'd like to talk about first is the period prior to the first use of force. I think everybody agrees about what was happening at this point. Mr. Frank is on the tractor. He's not complying with commands. He's not coming down. He's asking to see the warrant. His back is to a fence. He's surrounded by officers. He's not going anywhere. He's not threatening. He's not attacking. He's unarmed. And what I would submit is that the case law in this circuit requires that officers avail themselves of lesser alternatives that are, quote, plainly available, unquote, and, quote, obviously recommended by the situation. Now the case that that quote comes from does post-date the arrest in this matter. However, it relates to, it discusses what the clearly established law was in 2017, which was the time of this arrest. And in addition, it cites to cases such as Newman, which were decided prior to 2017. This proposition is also supported by the Crane case, which again post-dates this case, but discusses what was the clearly established law in February 2017, which is prior to the arrest here, and which relies on the DeVille and the Darden cases which predate this arrest. That there is an alternative before jumping to, you know, that there is a requirement, before just jumping to the use of force, to avail yourselves of plainly available and obviously recommended obligation, alternatives, that are recommended by this situation. And here, they could have shown him the warrant. The testimony was that the warrant was two minutes away, could have been brought very quickly, no risk to the officer's safety, no risk that Mr. Frank was going to escape. He wasn't going anywhere. He's unarmed. He's not attacking. And Deputy Daniel himself testified that he believed it was reasonable for someone who's being arrested to want to see the warrant. So, we're not saying that there's always a constitutional obligation to show an arrestee the warrant. We're certainly not saying that there's always an obligation for the officers to comply with what the arrestee wants, you know, as opposed to the arrestee complying with the arrest. We're not saying that. But we're saying that in this situation, where there would have been minimal delay and no risk to safety, that the clearly established law is that the officers had to avail themselves of this alternative. They didn't. And then, starting about two minutes into the encounter, we have about a 30-second period where the officers are trying to climb on the tractor. They're climbing one at a time. They attempt to use their hands to grab Mr. Frank. He is pulling and jerking away. However, this, again, is conduct that this court would not have prior to 2017 had found to be passive resistance rather than active resistance, which is below the line where a taser deployment can be used. Now, the officers, I believe, have claimed that Mr. Frank was digging in during this period, that it was escalating to active resistance. However, I re-watched the video last night. It's very far from clear to me that he was a guy who was an eyewitness for a great deal of this time, said that he wasn't fighting back. I think that this is a case where qualified immunity would hinge on facts that need to be found by a jury rather than by the district court, that I think there are genuine issues of fact here regarding whether Mr. Frank's resistance during these 30 seconds or so was active or whether it was still passive, and certainly whether, you know, the officers escalated to tasing too soon after never really just making a half-hearted attempt to seize him with their hands. You know, it could be they never tried grabbing him two at a time, for instance. There were ways short of a taser that they still could have exhausted here against passive resistance that they didn't exhaust. How many officers were present at that time, Nate? At that time, Your Honor, at that time there were still three. The backup had not yet arrived. But okay, now we'll go to the taser deployments. Let's say that the court were to agree that one use of the taser was appropriate. Let's say the court were to agree with the district court that far. We don't have one use of the taser here. We have seven taser shots, including one to the chest, which officers admitted they're trained not to do that. Their training is to split the belt line because a chest shot poses a risk of a heart attack. There at least two of the shots were drive stuns designed to complete a circuit to the chest. And at the same time, Deputy Spillman is climbing onto Mr. Frank, applying constriction, chokehold. And at one point, it definitely seems from the video like he's putting his whole 200-pound weight onto Mr. Frank. And in the meantime— The deputy weighed 200 pounds. Excuse me, Judge? The deputy weighed 200 pounds. I believe that's what's in the record, Judge, but he was certainly— How much did Mr. Frank weigh? I actually don't know that, Judge. You don't know how much he weighed? I believe— How tall he was? He was—I mean, from the video and the photos, he was not a small guy, but I don't think that—I mean, he wasn't a giant either. I don't know the exact numbers on that. I can certainly see if it's in the record. How old was he? It would most likely be in Dr. Tape's report. How old was he? He was, I believe, in his 40s. I know he had been in the Navy, and he had been discharged with a mental disability, I believe, about 20 years before. And he was not—I mean, I think he was a pretty average gentleman in terms of his physical size and appearance, albeit not, of course, in his behavior and his mental health history, which I'll get to. But I think one thing to keep in mind as well is that during these seven taser shots, before—you know, in the initial stages of the tasing, Deputy Spillman said this was Now, he said not only is it working, he says it's obviously working. And I think a jury could infer that what's obvious to him should be obvious to the other officers as well. And this maybe is the time to back off and let these shots work rather than delivering three more, including another drive stop. And, you know, then the backup arrives. They don't stop wailing on Mr. Frank even when they had him on the ground. Now, we've cited a number of cases in the brief, but what I'd like to mention as well is the MAR case, which is a very recent decision which I cited to in the letter that I filed last Thursday. It was decided just three weeks ago, and admittedly, it's a Ninth Circuit case. However, I would submit that it deserves some attention because the facts are, I think, the most similar facts to this case that I've seen in any of the research I've done thus far, in terms of the degree of resistance of the arrestee. In fact, the arrestee in MAR actually resisted somewhat more than Mr. Frank because he did attempt to flee. And a similar pattern of multiple taser shots, including drive stun shots, together with body compression on the arrestee's back. And out of this very similar fact pattern, the district, the Ninth Circuit found that there are issues of fact here regarding qualified immunity. And again, this is a 2023 case, but it cited a case called Drummond, which was decided in 2003, regarding pressure on the back and neck. And then cases called Bonnevere, which was 2018, and Agarano, which is 2011, regarding use of multiple taser shots and drive stun. And we also, in our brief, in our reply brief, we've cited a number of other cases, including single taser shot and multiple shots, single or a couple of shots and a shot to the chest, single or a couple of shots and a shot to the chest plus compression. That this is a much higher degree of force, and I believe I would submit that even if there was some degree of active resistance, as there was in the MAR case, as there was in some of the other cases we've cited in that regard, that maybe even if this court were to find that one tasing is appropriate, the sheer amount of force unleashed in a period of under a minute, and the areas to which this force was deployed, was excessive under clearly established law in 2017. Now, I'm coming toward the end of my time. I would just like to emphasize three quick points. First of all, one of my opposing counsel has raised the issue of causation, of whether the unconstitutional conduct caused Mr. Frank's death. Case law in this circuit is very clear. You don't have to prove that the conduct was the sole cause, and the eggshell skull rule applies. And we have a report from Dr. Fink that comprehensively analyzes death and attributes it both to Mr. Frank's pre-existing conditions and to the tasing and compression. And again, we don't have to prove it was the sole cause, just the contributing cause. And there's the plain fact that at the beginning of this incident, Mr. Frank was alive and well and in no apparent distress, and ten that, you know, if the, my opposing counsel wants to really get the jury angry, they're free to make this argument at trial, but it's not an issue that could be properly decided on summary judgment. And the district court, in fact, was quite correct in not getting to that issue. Second final point is mental illness. The officers did deny knowledge of Mr. Frank's history, but as in any case, knowledge can be proven circumstantially. And, you know, at least one of the officers knew he was a veteran, which, you know, they only would have known through his history with the VA. Did they have any other experience with Mr. Frank? Because there was some discussion in the video, I think maybe later on in the video after Mr. Frank is either put in the car where they seem to be implying that there was some previous engagement relating to his son or something like that. Do you know if there was any other prior history between the officers? His father had recently died, and the sheriff's office had been contacted by the VA to do a welfare check on him. And he had also been arrested before for that, for property crimes. And there was some discussion of this, and I believe it was Spillman's deposition where it was agreed that he had been arrested a number of times, and yes, you know, frequent arrestees become known to the department, officers talk. So I would submit that a jury could find here that there was circumstantial evidence that they knew about his issues. And finally... Does the record show that they knew, the officers knew at that time of his previous encounters? Well, not directly, Judge. But again, I would submit that circumstantially, based on the officers' admission that they did know that he was a veteran, they did know of his history with the VA, at least one of them did, because having done a welfare check. And then also just Mr. Spillman's deposition saying, small town, frequent arrestee, the department gets to know them, officers talk. There's certainly in the record that he had had a psychotic episode in the jail in Marksville, I believe a year, not sure if it was a year before or more like two years, but there had been a veteran's justice referral there. So I would submit that this is an issue of fact in this matter. And I'm out of time, so I'll reserve for rebuttal. Yeah, one question. The warrant, there was a warrant in this case for his arrest. There was a warrant. What was that warrant? What was the charge? It was theft. It was a property crime. It was a felony. Right. Thank you, Your Honor. May it please the court, I'm Brad Calvert here on behalf of former Sheriff Anderson, Deputy Spillman, and Deputy Daniel. In reference to one of the court's questions, the autopsy report does contain the information concerning Mr. Frank. He weighs 276 pounds, he was 6 feet tall, and he was 44 years of age. Reflecting upon the question relative to the warrant, it was never a dispute before the district court that it was for a felony warrant. If you look at the reply brief that was filed after, of course after our brief, there was some attempt to argue that it wasn't perhaps a felony warrant. For example, on page, it looks like 1368 was actually the warrant is he was charged with simple criminal trespassing, attempted unauthorized entry of an inhabited dwelling. The bond was set at $100,000 by Judge Bennett. In the record, it's mentioned that Daniel called, confirmed it was a felony warrant, and Judge Drell said there was no dispute among the parties that a felony warrant for the arrest of Armando Frank was active at the time of the incident. So that's also a non-issue. Now, talking to the facts discussed by the plaintiff's attorney, I'd like to begin with the discussion of the video. The video is the body-worn camera by Deputy Daniel. Deputy Daniel arrives on the scene, and it shows how police officers typically handle incidents involving a subject. The officers arrive, they identify themselves. They identify the purpose for which they're there. That typically references officer presence. Most of the time that gets compliance from whatever the subject and whatever the issue is. Once officer presence doesn't work, then they move to commands. And you can see on the video, they begin first asking him and then telling him, you need to get off the tractor. He refuses to comply. And so then they go to verbal commands, get down, et cetera, explain the warrant, tell him he's essentially under arrest. At no time during this climb up the use of force continuum is there any compliance. Now, speaking of the officers, excuse me, the deputies and the officers' responses, I don't represent Parnell. What Parnell did, the lieutenant for the Marshall Police Department, is based upon his training, observations, and experience relative to handling calls. I'm not going to talk about Parnell, except to the extent it impacts what the other deputies may have done. Speaking of Daniel and Spillman, Daniel was the one that was the lead person speaking to Mr. Frank about the events, explaining what was going on and what they needed to talk about. Spillman was there in support. Now, much was made of seven taser shots. Taser... I guess I want to talk about the warrant. Sure. He asked to see the warrant. Sure. There was one. There was... I don't believe this is explicit in the record. They got confirmation over the radio. Parnell got confirmation over the radio for his department that there was a felony warrant. Daniel got confirmation over his radio that there's a felony warrant. They're not looking... How did they end up walking up to the tractor and saying they wanted to talk to him? What led them to him that day? Backing up for a moment, Spillman, who was a deputy, was off duty but following up on a matter that arose in a prior shift. He was off duty at Wal-Mart. Someone at Wal-Mart, a citizen, brought to Spillman's attention that there was a gentleman named Armando Frank, there was a warrant for his arrest, and that Armando Frank was sitting on his tractor in the back or the side of Wal-Mart. So a citizen? Yes. At Wal-Mart. Spillman called into the command center to talk to the supervisor. He wasn't on duty. It's not his job to follow up on that. So he called and reported it and spoke to the lieutenant. He told the lieutenant what he had been told. The lieutenant dispatched Daniel to follow up on the call. The lieutenant told him there was a warrant. Then Daniel went behind that information and got his own confirmation that it was a warrant. Separate and apart from that, Parnell, through his dispatch system, evidently was sent to back up the event. He also, he being Spillman, I'm sorry, Parnell, confirmed through his system that there was an active warrant. So as far as anyone having the paper warrant, nobody did. It was back in the file cabinet somewhere. Your opposing counsel says that the warrant was two minutes away. Is that the record anyway? No. The questions were how far was the police, the sheriff's station, the sheriff's office, two minutes. Warrants don't just sit around on tables. They're in files. What you have is a computer screen with the active warrants. When you call in, they don't go look in a file. So it's disingenuous to argue that because it was two minutes away, all someone had to do was leave the location, go over there, walk in and pick up the warrant and walk out. That's not how it happens. Well, you walk in and you put it up on the screen and you hit print. No. Well, back in those days, you may now, I don't know, but back in those days, it was just lines. You type in someone's name and identifier and it pops up. It would have access to state computers, which would tell them there's warrants from Baton Rouge or wherever it may be. So you don't see the warrant. So getting back, I'm sorry. No, go ahead. Okay, so getting back to the location, the officers identify themselves. They give the commands, no response. Under Louisiana law, Mr. Frank is required to submit. He didn't. Now, during the process, Parnell fired, according to him, three or four taser shots. And looking at both Dr. Tape's testimony and the autopsy report, there is no evidence that any electricity traveled through his body. When you fire a taser, if you don't get connection between both leads, you don't have pain compliance, you don't have anything. So to say that seven shots ends up with seven applications of electricity is wrong. Dr. Tape said there's no medical evidence, but Dr. Tape, in his lay opinion, saw perhaps one taser response. He saw a huge response from Deputy Spillman, and I'm sure if y'all have seen the video, you've seen Mr. Spillman's response. If you look at the video, Mr. Frank never provides that kind of response. Now, Daniel says in his three taser shots, not to the chest, the three that Daniel tried was a probe shot. You can see in the video, Daniel's got his taser, Parnell's already fired his taser. Daniel fires to the leg. There's no showing in the video that Frank responded to that at all. Leads me to conclude without evidence there was no electricity introduced into the body. Similarly, there are drive stuns. A drive stun is when the probe, the probes are fired out by compressed gas. You pull the box off the end of the taser, and then you've got the two leads, the two contact points. A drive stun is an application of those two points to your body. When you have the spread, that's when you get the shock you see on TV where people fall over. When you do a drive stun, it's a pain compliance technique, and it only applies electricity to this area. When Daniel describes in his deposition the drive stuns, he admits that perhaps he gets one brief contact, but when you watch the So even though the taser triggers may have been pulled seven times, there is no evidence that the electricity that would have been produced had there been contact actually entered his body on the medical side. In the layman's sense that Daniel described, he thought he got good contact just for a moment. Now if you look at the video, much is made of passive or aggressive, excuse me, passive or active resistance. In Judge Drell's opinion, he quotes bets, I believe, that the line between active and passive is hazy at best. To give you an example, suppose Mr. Frank would have come off the tractor and would have been laying on the ground, and he's got his arms underneath his stomach, and the officers are trying to And he's a big man, 276 pounds, 6 feet tall. If they're not able to pull his arms out, some experts might say that that's passive resistance. He's not shoving, he's not kicking. But if the officers have him on the ground on his belly, and he's not giving them their hands, what can they do? Kick him? Hit him? Or perhaps use a taser? And that's why active and passive resistance is a hazy line, so to speak, as pointed out by the district court. Well, other than the warrant, how do you distinguish this from the Floyd case? Which case, sir? Floyd. The national... Oh, simple, sure. Mr. Floyd was not known to have committed a felony. Yeah, I said other than the warrant. Well, you can still have a felony arrest without the warrant. In other words, when they laid hands on Mr. Floyd, there was no felony involved by warrant or by probable cause or anything. Secondarily, the officers, according to the video, and I hadn't watched the whole thing and seen all the video, the officers applied compression to Floyd the whole time. That's not what happened here. If you look at the video, there is no evidence in the Floyd case, it was evident at some point he became unconscious. If you look at the video in this case, Mr. Frank was fighting and resisting the entire time. He never... It's your contention that at no point in time did he ever become unconscious? When the two deputies were dealing with him, that's what I'm talking about. What happened later, those people aren't here in court. When he came off the tractor, he was not unconscious. And that's what my two clients are sued for. For whatever reason, suit wasn't filed against all the other deputies. There was officers there from Cottonport, Marksville, I don't know where all. And they're the ones that carried on the train, so to speak. And that's not before the court. What's before the court are the uses of force by my clients. Well, and I guess I want to talk about what you call evidence of resistance from the video. Sure. I watched the video. It is difficult for me to determine how much resistance there is during the period of time where, from the time the choke hold is applied to, I guess, pressing him up against the steering wheel and getting him... I mean, his arm gets twisted in a way that was... It was painful for me to watch the way his arm was twisted. Well, the handcuffing technique, and that was done by Parnell. Whatever it's called, it was difficult for me to watch how his arm was twisted up behind his back and the way they pulled it. Now, you're telling me that there's evidence... What do you call evidence of resistance? I saw them trying, I mean, pushing his arm behind his back, trying to get him off the tractor, get him down on the ground. But what did you see that was evidence of his resistance? Sure. When you're looking at... Of course, the body cam is following the chest of the deputy that's involved in it. You see when the deputy moves along... I'm sorry, this is Daniel. When he moves along the side of the tractor, you can see the subject, Mr. Frank's hand, is on a handhold. The handhold is typically used to get on the tractor, and they tried to just manually remove his hand from that, and they struggle. If you look at the video from the side taken by the... That's the same hand that they end up beating behind his back. It's not they. It's Parnell. I mean, that's one of the issues with this whole thing. I represent Daniel and Spillman, and there's no group effort. So once they get it loose from this hole, what you're telling me is he was still resisting. Sure. What I saw was his arm being bent up behind his back. I can't tell whether he's resisting because they successfully get it there. I can't tell whether he's resisting or not, and it happens pretty quickly, so there's no... There's evidence that he was actively resisting, and that's my problem, which just gets me to, isn't there a real question of fact about what was going on in those moments? Because I think your contention is there's clear evidence on the video that he was resisting. Right. That's what I want you to tell me what I'm supposed to be saying. The hand is here. A handcuff. What they're doing is Parnell is trying to get the arm behind him to be handcuffed. That's a handcuff technique. Of course, it's awkward because they're on the ground trying to do this. Now, if you look when he steps back, they're trying to pry his feet off of the floorboard as well. And so you can hear him talking about moving his feet, move his leg. You're telling me it's a handcuffing technique to push a person's wrist and hand up towards the back of their head. Yeah, sure. Up towards the back of their head. The problem, the issue perhaps, is they were on a tractor. And there's no training on how to apprehend someone on a tractor. What there is training on is handcuffing techniques, strikes and things like that. I'm not defending Parnell, but Parnell comes around and he tries to do a handcuffing technique. Because of how it worked, it was above his shoulders. But if you look on the video when he steps back out and you look, they're pulling on his feet. I'm sorry, but they're pulling on his feet and you can hear the discussion about what else he's doing. And so I think the video, sure. You're telling me I can hear the discussion about where it's going. But I'm telling you, I'm looking at what's happening. So you're telling me it's like when an officer is saying, stop resisting. And I'm watching a video where nobody is resisting, but the officer is. So I can conclude what he did based on what they said he was doing. But they continue with his feet. They say something about his feet or whatever, and they continue pulling on his feet after the handcuffing technique is attempted. He never gave up. He never said, okay. He never quit fighting the whole time. My time is obviously up. Anything else? Rebuttal. Oh, I'm sorry. Judge Ott. Not quite yet. I apologize, Judge Ott. And I was just going to say I apologize, Your Honor, for the confusion. Stacey Allzean for the City of Marksville and Lieutenant Poynell. Your Honors, I have listened to the back and forth between this court and the lawyers, and I seem to be focused perhaps incorrectly on some things that occurred during this incident. And let me apologize to the court up front. I was not the attorney during the initial phases of this case. Through a change in city attorney for the City of Marksville, the new city attorney had a conflict, and he hired me to handle the appeal on this case. So a lot of this I have picked up from the Cole record secondhand through discussions, either with opposing counsel or co-counsel, Mr. Calvin. There were a couple of cases that opposing counsel cited that he wanted to discuss because they came up recently, a Ninth Circuit case and the Fifth Circuit Cabo case. If I could perhaps factually distinguish them for the court, the Cabo case was a case where a gentleman, Mr. Cabo, was going home after shift work. He was stopped by St. Tangibahoa Sheriff and one state trooper. During the course of this stop, they asked Mr. Cabo, throw your keys out the window. He did. Step out of the car. He did not. Five deputies pushed, pulled him, dragged him, got him out of the car, face down on the pavement. At that point, they're trying to cuff him, much as you heard Mr. Calvin describe about Mr. Frank. Mr. Cabo would not put his hands behind him. Again, he had his hands underneath him on the ground. After several attempts, again, you've got five officers laying on his buttocks, his legs, his top. Finally, the lone state policeman delivered as he hollered taser, taser, he delivered one stun, drive stun to Mr. Cabo's leg. At that point, Mr. Cabo put his hands back behind his back and he was cuffed. The probable cause to stop in that case was an improper lane usage. Now, I'm not going to get into that. Your honors have probably seen millions of cases where officers stop folks suspected of driving under the influence for an improper lane usage. But they did find marijuana on Mr. Cabo and they did charge him with resisting arrest. I think that the reason this court overturned the grant of qualified immunity by the district court in a summary judgment was because the state police trooper wrote in his report that Mr. Cabo didn't resist arrest, that there was no danger to the officers, that Mr. Cabo didn't try to flee. Those things are contradicted by the body cam in that case. And I think anybody could see the genuine issue of fact there. The MAR case, I would beg to disagree with opposing counsel. This was a case where there was a call out for a burglary in Los Angeles County. When the officers arrived, they found the perpetrator, alleged perpetrator, appeared to be intoxicated. As they tried to stop him, he ran. Some distance, he jumped a fence. He went down an embankment, fell down. The case says or the facts say that he was unconscious at the bottom of the embankment. The officers ran, slid, skid, however they got down the embankment, and for whatever reason that I can't explain to the court decided some guys sat on him, some guys tased him. Eventually, this gentleman who was under the weight of several Los Angeles County officers died. Passersby and other witnesses say they could hear the fellow screaming in pain, and obviously that's, I believe, different facts than Mr. Frank. I analogized it to the court, and I thought about my analogy, and perhaps it's not proper. I said trying to bring down Mr. Frank, who you just heard is 6 feet tall, 276 pounds, 44 years old, and a service veteran. I don't know which branch he was in. Obviously, he has had some training in hand-to-hand combat. Whichever service you're in, as far as the officers knowing this gentleman, again, that's a hazy line. Yes, Evalds Parish is small. Yes, the city of Marksville is a smaller town in Evalds Parish. It's about 50,000 people or so. To say everybody knows everybody and everybody's mental health history, I think, is a stretch. There was this outstanding warrant on Mr. Frank. I think we've heard it was some type of criminal trespass. Here in this case, on the video, one of the officers makes clear that not only is this a small town, but he's had some interaction with Mr. Frank prior to the encounter here. Yes, Your Honor, I believe there was some vague discussion about that. It was never clear where that came from or which officer. Because, again, you've got line deputies like Deputy Spillman and perhaps Deputy Daniel, and my client, Mr. Parnell, was a lieutenant. He was dispatched from, I believe, Marksville, P.D., which may have been, as opposed to the sheriff, five to seven minutes away from the Walmart, on this call from this citizen about this gentleman sitting on this tractor. Why they decided that was something, again, of all, it's a small town. Everybody, quote, knows everybody. But in this case, the officers did not have any direct history with Mr. Frank that I could find in the record. I stand to be corrected. And I see I'm out of time, and I appreciate Your Honor's patience. But if you have any questions, I'll try to answer them. Thank you, Counsel. Thank you, Your Honor. Thank you. Your Honors, briefly about the warrant. It was a felony warrant. No one's disputing that. We agreed with that in our briefs. That's also not a dispositive fact, as shown in the Crane case, where the defendant was being arrested on a presumed felony warrant plus two confirmed misdemeanor warrants, but nevertheless excessive force was found. There was also testimony that Lieutenant McMoneagle of the Avoyal Sheriff's Office, when he advised Deputy Daniel of the warrant, advised Daniel that, quote, the physical copy of the warrant, unquote, was located at the patrol desk in the Avoyal Parish Sheriff's Office headquarters. So it's not a situation where they're going to have to rummage for the warrant. They know where it is. It's at the desk. Nor would they have had to go to the sheriff's office themselves. They could have asked Lieutenant McMoneagle or someone at the patrol desk that, look, bring a copy of the warrant over. And there was testimony by a number of these officers, which is cited in the briefs, that the sheriff's office headquarters is a couple of minutes away. There were no exigent circumstances that Deputy Spillman testified. I'm sure there could have been time. That Deputy Daniel, in fact, says there's not aware of any downside to getting the warrant, and that it's a reasonable question by Mr. Frank. So I would submit that this is really not a situation where it would have been any trouble on this record to get the warrant and to show it to Mr. Frank. Now, I'd also like to discuss something that was said by my opposing counsel, that the line between active and passive resistance is often hazy. And you know what? That's true. That's an observation that this Court has made, and that's also the reason why it's most often an issue of fact for the jury. If a line is hazy, then for the most part it's to be determined by the jury rather than by the court which side of the line these facts lie. And I would submit again, where we're dealing with a video that is from one point of view, we have another partial video from Paige Rochelle, which is from some distance away, and where in fact, you know, counsel, I think, implicitly acknowledged that it could be hard to tell at certain points what Mr. Frank is doing, that there are issues of fact about whether his resistance at critical points is active or passive, or for that matter, whether it might be, as this Court observed in the Crane case, whether some of his body movements might have been automatic responses to the tasers or to the twisting and choking that was being applied. And speaking about the effect of the taser, I mean, opposing counsel stated there's no evidence that electricity traveled through his body. On the other hand, Lieutenant Parnell, who's at the scene at the time, and who is certainly no stranger to observing people who've been tased and who has been trained in the use of tasers, testifies the taser is obviously working. So again, I think we've got issues of fact here regarding what was happening at that particular time with regard to the tasers and what effect they were having on Mr. Frank. And again, I would note also that while Mr. Frank was conscious after being taken off the tractor, opposing counsel was correct about that. The testimony in the record is that he was coughing and gasping, he was speaking in a deep and strained voice, and that his breathing was labored. So I would submit that this is not a situation where any of the defendants in this case can just blame it on the backup and say, you know, he died, it was all because of what the backup officers did. These three had nothing to do with it. Now, I was not the plaintiff's counsel in the court below. I don't know why particular defendants were sued and not sued. But we're here on an appeal from a motion for summary judgment, and on this record there are obvious issues of fact as to causation. And finally, on the MAR case, I'll invite the court to read the case. It's a very short case. But I would submit that based on the court's description of the facts, the decedent, he was lying motionless when they found him, you know, at the bottom of a drainage wash after he had attempted to flee. But he was pretty clearly not unconscious because he's tensing and moving his body and resisting being handcuffed throughout the, or at least for a certain period during the encounter with the officers. So I would submit this is a very similar case and that this court should reach the same result. And having finished my time, I will rest on the briefs. Thank you, Your Honors. Your Honor, one question. Since counsel found these two cases relatively recently, the Cobble and the MAR case, would the court entertain a very brief brief of those cases in light of this one? Absolutely. And I would be permitted to respond to whatever filing they might make? Yes. Five days. That's fine, Your Honor. Whatever you give us, I'll take it. All right. Five days. Thank you, Judge. All right. That concludes the matters that are on today's docket for oral arguments, and we are adjourned for the day.